John P. Aldrich, Esq.
Nevada Bar No.: 6877
**ALDRICH LAW FIRM, LTD.**
1601 S. Rainbow Blvd, Ste 160
Las Vegas, Nevada 89146
Telephone: (702) 583-6748
Facsimile:  (702) 227-1975
jaldrich@johnaldrichlawfirm.com

Lynda J. Grant, Esq.
**THE GRANT LAW FIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, New York 10175
Telephone: (212) 292-4441
Facsimile:  (212) 292-4442
lgrant@grantfirm.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| IRA GAINS, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| SPECTRUM PHARMACEUTICALS, INC. and RAJESH C. SHROTRIYA, | |
| Defendants. | DEMAND FOR JURY TRIAL |

Plaintiff, Ira Gains ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Complaint against Spectrum Pharmaceuticals, Inc. and Rajesh C. Shrotriya ("Defendants"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Spectrum Pharmaceuticals, Inc. ("Spectrum" or the "Company"), as well as

media and other reports about the Company, and statements made by members of the Board and management, including and in particular, Rajesch C. Shrotriya ("Shrotriya").Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired securities of Spectrum between May 7, 2015 and October 23, 2015, inclusive (the "Class Period"), against Spectrum and certain of its current officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").  These claims are asserted against Spectrum and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC, among other things.

2.      Spectrum is a biotechnology company with fully integrated commercial and drug development operations, with a primary focus on oncology and hematology.  Spectrum's strategy is comprised of the (i) commercialization of cancer therapeutics through their U.S. direct sales force and international distributors, (ii) completion of studies for new indications of their marketed products, and (iii) the acquisition, development and marketing of a purported broad and diverse pipeline of late-stage clinical and commercial drug compounds.

3.      Spectrum currently markets five drugs for the treatment of cancer: the FUSILEV injection for patients with advanced metastatic colorectal cancer and to counteract certain side effects of methotrexate therapy; the ZEVALIN injection for patients with follicular non-Hodgkin's lymphoma; the FOLOTYN injection for patients with relapsed or refractory peripheral T-cell lymphoma ("PTCL"); the MARQIBO injection for patients with relapsed Philadelphia

chromosome–negative acute lymphoblastic leukemia; and the BELEODAQ injection for patients with relapsed or refractory PTCL.

4.    This case involves the Company's drug presently in development called EVOMELA, a propylene glycol-free formulation of melphalan, the drug presently in use for the treatment of multiple myolema.

5.    Spectrum obtained the rights to develop and hold clinical trials for EVOMELA from Ligand Pharmaceuticals, Inc. ("Ligand") in March 2013, and was responsible for holding clinical trials and submitting a New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA").    Given the high royalty payments and future milestone payments due to Ligand, the Company was induced to mislead the investing public concerning the progress of EVOMELA's NDA application before the FDA and the value of EVOMELA to the Company.

6.    Further, during the Class Period, the Company, and particularly Shrotriya, was under attack by major activist shareholders, including Armistice Capital LLC ("Armistice"), for the Company's poor performance, and its intentional conduct in manipulating its results in comparison to peer companies, among other things, and calling for Shrotryia's ouster.

7.    One of the few saving graces of the Company, according to Armistice, was the purported "meaningful, low risk, near-term commercial opportunity" for EVOMELA, and the possibility that marketing EVOMELA by 2015, could be half of the Company's market capitalization.

8.    As a consequence of these pressures, and the fact that management's and Shrotriya's compensation was tied to milestones in the development of EVOMELA, among other things, the Company, through Shrotriya, among others, disseminated false and misleading statements during the Class Period about the potential for EVOMELA, the progress of its NDA application before the FDA, and thus the possibility that the drug would drive the Company's revenues by the end of 2015.

9.   As such, during the Class Period, the Defendants made repeated misleadingly optimistic statements about EVOMELA, specifically touting it a future driver of the Company's revenues, and repeatedly, falsely stating that the Company "fully expected" the FDA to approve the NDA by October 23, 2015, and that that the drug would likely be marketed by year end 2015.[1]

10.   At the time that they made these statements, the Defendants knew that: (1) EVOMELA is not materially clinically distinct from standard melphalan, a drug that is presently being used in hospitals to treat multiple myeloma; (2) that their statements that current treatment contains proplyene glycol, which the Company touted as toxic, is not toxic when used as an additive; and (3) that it is unlikely that doctors currently using generic melphalan would suddenly switch to EVOMELA.  Thus, they knew that FDA approval of the EVOMELA was not likely.

11.   On October 23, 2015, the Company received a Complete Response from the FDA indicating that it was not approving the NDA for EVOMELA, contrary to the Company's earlier statements ensuring the public that the application would be approved causing the Company's stock to drop $1.31 per share to close at $5.33 per share on October 23, 2015, a one-day decline 20% on volume of 4.8 million shares.   The stock price has not recovered.

12.   Defendants had a motive to make these misleading statements and acted with the requisite scienter in that:  (1) they had milestone payments due to Ligand, and therefore needed to keep the stock price high so that they could raise money to make these payments, as the Company was potentially running out of money given its losses with respect to certain of its other products; (2) they could award themselves large salaries and incentive bonuses, particularly given the way in which compensation was structured; and (3) to distract the public from the Company's loss of a major patent lawsuit in February 2015 against Sandoz, Lt. ("Sandoz") relating to its drug, FOLOTYN, as result of which the Company now faces competition from generic drug makers.

---

[1] See Spectrum Press Release dated March 30, 2015 http://investor.sppirx.com/releasedetail.cfm?ReleaseID=903923

13.     Plaintiff has filed this action in order to recover for the damages which he and Class members (defined below) suffered as a consequence of Defendants' wrongdoing.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) by the SEC.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act and 28 U.S.C §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

15.     Spectrum maintains its principal executive office at 11500 South Eastern Avenue, Suite 240, Henderson, Nevada 89052.  Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District and Defendants are present in this District.

16.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

17.     Plaintiff purchased the securities of Spectrum during the Class Period as set forth in the certification attached hereto and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

18.     Defendant Spectrum is a Delaware Corporation that maintains its principal place of business at 11500 South Eastern Avenue, Suite 240, Henderson, Nevada 89052.It is named as a defendant herein so that complete relief can be granted.  Spectrum is a biotechnology company with integrated commercial and drug development operations with a focus on hematology and oncology. Spectrum securities are traded on the NASDAQ stock market under the ticker symbol "SPPI."

19.     Defendant Shrotriya has been a director, President and Chief Operating Officer of Spectrum since 2000.  In August 2002, he was appointed Chief Executive Officer.  Previously, Shrotriya was Executive Vice President and Chief Scientific Officer for SuperGen, Inc. and Vice President, Medical Affairs and Vice President, Chief Medical Officer at MGI Pharma, Inc.  For the year ended December 31, 2014, Shrotriya was paid $4,828,563 salary including stock awards and option awards.

20.     His compensation and that of other members of management are tied to annual goals including: (1) the achievement of revenue targets; (2) the acquisition of commercial products; (3) the management of the Company's pipeline; and (4) the advancement of clinical trials, among other things, giving him every incentive to push through EVOMELA's clinical trials, and to rush the NDA application before the FDA.

21.     Shrotriya's compensation has been under attack for at least the last ten years, with activist shareholders asserting that Shrotriya has received compensation over the past ten years of $65 million or 17% of the Company's market capitalization, while making false statements and/or mishandling the Company's pipeline of drugs.

22.     The defendant Shrotriya named above is also referred to herein as the "Individual Defendant."

23.     The Individual Defendant, because of his positions with the Company, possessed the power and authority to control the contents of Spectrum's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e. the market.  He was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position with the Company, and his access to material non-public information available to him but not to the public, the Individual

Defendant knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and mislead. The Individual Defendant is liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

24. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Spectrum, and in particular, the likelihood that EVOMELA would be approved by the FDA, and that it would drive the Company's revenues by year end. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Spectrum securities was a success, as it: (i) deceived the investing public regarding Spectrum's prospects and business; (ii) artificially inflated the price of Spectrum securities; and (iii) caused Plaintiff and other members of the Class to purchase Spectrum securities at inflated prices.

25. As stated above, Shrotriya's compensation and that of management was tied to milestones which provided them with every incentive to keep the price of Spectrum stock artificially inflated, and to make materially false statements about Spectrum's progress with the FDA concerning EVOMELA.

26. Defendants were also compensated based on Spectrum's stock prices maintaining certain levels over specified periods of time. For 2011, such compensation was tied to Spectrum's market capitalization exceeding $750 million over a specified time period. For subsequent years, the market capitalization target for compensation was $1 billion. Depending on the number of shares outstanding, this meant Spectrum's stock price need to trade above $13.00 per share. Had defendants fully disclosed the impact FDA's issuance of the Complete Response Letter informing Spectrum that the EVOMELA application cannot be approved in its present form, Spectrum's stock would have declined and the Company would have fallen well short of its market capitalization targets.

27.     Further, in September 2014, the Company entered into a licensing agreement with CASI Pharmaceuticals, Inc. ("CASI") pursuant to which the Company received equity of 19.9% of CASI's outstanding stock, and a secured promissory note, in exchange for the right to sell ZEVALIN, MARQIBA and C-E MEPHALAN or EVOMELA in China – make NDA approval critical.

**BACKGROUND**

*Spectrum's Management has a History of Making Misleading Statements*

28.     In March 2013, Spectrum obtained the licensing right to global development and commercialization rights to EVOMELA also referred to as CE-Melphalan from Ligand making it responsible for the successful clinical trials for EVOMELA, and putting the Company under pressure to perform and to meet the milestone payments which are required to be made to Ligand, including royalties on net sales following potential commercialization.

29.     Placing further pressure on the Company and particularly on Shrotriya, on May 11, 2015, Shrotriya received a letter ("Armistice Letter") from activist shareholder, Armistice.  In that letter, Armistice noted that the Company has in the past made misleading statements concerning its ability to file and secure approval of the FDA of its NDAs, using as an example its failure to have filed an NDA for apaziquone to date after representing that it would file one in 2013 and 2014.

30.     It stated, "the disconnect between your statements and reality created distrust in the investment community, employee turnover, shareholder lawsuit expense, and an SEC investigation that is on-going."

31.     It also accused the Company, and particularly Shrotriya of falsifying the Company's SEC filings in relation to management compensation by redefining the peer group used in the Company's Form 10-K.  Armistice noted that there were new additions, including Thervance Biopharma and Salix Pharmaceuticals, that "have little in common with [Spectrum] besides dismal

share price performance in the second half of 2014" whereas others, such as Regeneron, "a stellar performer, was removed, but Dendreon ("DNDNQ"), a bankrupt entity with no on-going operations, was kept."

32.     Managements' lack of "integrity' has not only subjected it to an SEC investigation, but has been confirmed by numerous investors, for example, who have written "I would never touch Spectrum.  Management integrity should be one of the more important factors when you invest. Please see management's forward-looking statements on Fusilev, Folotyn and Zevalin, Euphemistically "Way off", and others who have said, "management has proven itself completely untrustworthy."

33.     Nonetheless, because compensation is significantly tied to the Company's stock price, management, and particularly Shrotriya has had a history of delaying bad news while awarding himself and others compensation based upon an inflated stock price.

34.     For instance, the Armistice Letter notes that on the night Spectrum lost its United States District Court case against Sandoz for alleged patent violations thereby exposing half of its revenue to potential generic competition, Spectrum delayed disclosing the results of that action, while it awarded nearly $2 million of cash bonuses to its four top executives accompanied by increases in their bases salaries.

35.     On June 2, 2015, Armistice sent another letter to Shrotriya, indicating that "executive compensation at Spectrum has been deplorable for more than ten years", and that the Board ignored two negative votes on "say on pay", including other Board members.

***EVOMELA Is Not Materially Distinct from Current Drug Treatments***

36.     EVOMELA is a propylene glycol-free formulation of melphalan with improved stability compared to the approved versions of melphalan. It is used treatment of multiple myeloma. In April 2014, the Company reported that EVOMELA had met its primary endpoint in a pivotal trial

for use as a conditioning treatment prior to autologous stem cell transplant for patients with multiple myeloma. As a result, the Company filed a NDA with the FDA in December 2014.

37.    The key competitive formulation to EVOMELA is the standard melphalan which is currently sold by two companies.[2]  In addition, the differences between Evomela and standard melphalan are not clinically meaningful.[3]  Spectrum has publicly stated that one of the key benefits of EVOMELA is that the formulation completely avoids the use of propylene glycol which has been reported to cause renal and cardiac side-effects.  However, according to the Agency for Toxic Substances and Disease Registry at the CDC: "propylene glycol is a 'generally recognized as safe' additive for foods and medications.  Propylene glycol rarely causes toxic effects, and then only under very unusual circumstances."[4]

38.    In addition, Seeking Alpha article *Spectrum Pharmaceuticals: Our Thoughts On Armistice Capital's 13D* confirms that they could not find any case of propylene glycol-related toxicity from the use of standard melphalan in the science literature.

39.    In addition, certain markets for melphalan are apparently declining based on Symphony Health Solutions data and Spectrum's own information.  In July 2013, Spectrum on its own website stated that "the current intravenous Melphalan market is approximately $130 million annually, with predominant use in stem cell transplants."  As of February 2015 Spectrum's website stated that "the current intravenous Melphalan market is approximately $100 million annually, with predominant use in stem cell transplants."

40.    Defendants were aware of these facts, and that this could impact EVOMELA's NDA, but did not disclose it the public.

---

[2] See http://www.drugs.com/international/melphalan.html and also http://seekingalpha.com/article/3191436-spectrum-pharmaceuticals-our-thoughts-on-armistice-capitals-13d?page=2
[3] See http://seekingalpha.com/article/3191436-spectrum-pharmaceuticals-our-thoughts-on-armistice-capitals-13d?page=2
[4] See http://seekingalpha.com/article/2940386-spectrum-pharmaceuticals-update-following-district-court-invalidation-of-certain-claims-of-the-829-patent

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

41.     Instead, during the Class Period, in an effort to inflate the price of Spectrum's shares, and their concomitant remuneration (which had be decimated by the earlier disclosure of the Company's loss of its patent infringement action against Sandoz), the Company, and most particularly Shrotriya, made materially false and misleading statements concerning EVOMELA's ability to act as a catalyst to the Company's revenues and to be marketed by year end.

42.     On May 7, 2015, the Company filed a press release on Form 8-K, entitled "Spectrum Pharmaceuticals Reports Continued Advancement of Robust, Late-State Pipeline and First Quarter 2015 Financial Results, in which it stated that the Company had made "[s]ignficant progress in Q1 on Two Potential Blockbusters and Two Near-Term NDA's", unequivocally stating that EVOMELA was "on track for approval decision on October 23, 2015".

43.     On May 8, 2015, the Company held its first quarter 2015 conference call, in which Shrotriya reviewed the Company's 2015 pipeline, indicating that 2015 "should be a pivotal year for several drugs in our pipeline", including EVOMELA.

44.     With respect to EVOMELA, Shrotriya stated,

> "I would like to highlight our proplylene-gycol free EVOMELA whose NDA is current under active review by the FDA.  The PDUFA date for this drug is October 23, 2015.  In February, we presented pivotal data that support the safety and efficacy of EVOMELA in patients with multiple myeloma undergoing transplant.  EVOMELA has increased stability, which allow it have a longer use time, which in turn simplifies clinical administration.  Once approved, we plan to launch this drug using our existing sales force."

45.     Shrotriya never indicated that there could be a problem with approval of the NDA and in fact, gave the opposite impression – that the drug would likely be marketed by the end of the year. As a consequence of those statements, the price of Spectrum's shares began to rise.

46.     This was followed by Spectrum's appearance at the Jefferies Global Healthcare Conference on June 3, 2015.  At that conference, the Company touted EVOMELA as "[s]trong

growth driver" presently under review with the FDA, and as one of the drugs positioning Spectrum for "long-term growth." Although the Company indicated that it expected a decision from the FDA by October 23, 2015, there was no indication in its written materials that the FDA could refuse the NDA. In fact, just the opposite impression was conveyed.

47. On August 6, 2015, the Company disseminated another press release reporting on its Second Quarter 2015 financials. In that release, filed with the SEC as an exhibit to a Form 8-K, filed on the same date, the Company once again assured the investing public that EVOMELA's NDA was on "track" for an FDA decision. Shrotriya stated, "[t]he results from this quarter demonstrate our ability to maintain financial discipline while continuing to fund our highest priority projects" of which EVOMELA was one. He continued, "[w]ith the potential approval of Evomela in October, we could have six drugs on the market . . . .[o]ur pipeline has never been as exciting as it is today, and provides a sound foundation for future growth of the company." Nowhere did Shrotriya mention that the NDA might not be approved for the reasons stated above.

48. Instead, he stated, "NDA review is ongoing and is on track for an FDA decision on October 23, 2015. This drug is expected to be launched using Spectrum's existing sales force, and pre-launch activities have commenced." The clear import of Shrotriya's statements were that the NDA would be approved.

49. These falsely optimistic statements were reiterated on August 7, 2015, during Spectrum's second quarter 2015 earnings conference call, in which Shrotriya stated, "I'm very excited about EVOMELA's potential approval later this year. The discussion with the FDA are proceeding well and if approved, EVOMELA will become our sixth commercial drug that will be launched with our existing sales force"

50. During the conference call Joseph Turgeon states as follows:

> As you know, our base business is just a stepping stone for us. The cash flows from our base business help us develop our pipeline and our pipeline has never

been stronger. First, let's talk about EVOMELA.

If approved in October, EVOMELA will be our sixth product in the market in the hematology/oncology space. EVOMELA has a stability advantage of 4 to 6 hours versus the current version that is only stable for 1 hour. This represents an important point of differentiation as the current administration process is cumbersome and disruptive for caregivers when treating patients. Our product is propylene-glycol free and the peak in systemic exposure is about 10% higher. The efficacy and safety were consistent with what we already know for high-dose melphalan followed by transplant for multiple myeloma. The melphalan market is around $100 million and is concentrated in just 100 transplant centers across the US. The top 20 centers represent over 50% of the business. This market is very concentrated and has excellent synergy with our existing infrastructure. We look forward to October 23 and bringing this drug to market with our existing sales force.

51.     During the same conference call Lee Allen ("Allen") stated in part:

For EVOMELA, our novel propylene-glycol free formulation of melphalan, we remain on track for an NDA decision by FDA on October 23. We have been quick to respond to the FDA information requests and are happy to report that the review is progressing well and we are now only two and a half months from our PDUFA date.

In addition to the currently approved indication for melphalan, which is for the palliative treatment of multiple myeloma patients who cannot take oral medication, we have specifically developed EVOMELA [indiscernible] with FDA for its use as a high dose conditioning treatment prior to stem cell transplantation in patients with multiple myeloma.

As a reminder, E[V]OMELA has been branded orphan drug designation by FDA for this transplant positioning indication. It's also important to remember that there is currently no drug approved by FDA for use as a high dose conditioning agent for these patients with multiple myeloma.

Our novel, even though a formulation, uses Captisol to improve solubility and stability of melphalan and has eliminated the need for propylene-glycol containing solvents. Importantly, this allows for longer use in infusion times, which simplifies its clinical use and administration logistics. Our medical team has been actively working to support the successful launch of EVOMELA, if approved later this year.

52.     During the conference call Swayampakula Ramakanth with HC Wauinwrigth asked the following question:

A quick question on EVOMELA, could you please discuss with us how your conversations with FDA has been especially with just two months away from approval and what arrangements are you doing in terms of getting a good

launch out of this product?

Shrotriya let Allen and Thomas Riga ("Riga") both address the question as follows:

> As far as the discussion with the FDA, again, they have submitted some information request for us, there has been nothing that's been challenging or difficult to answer. We've been able to very quickly address their concerns or questions. And really there aren't – no pending issues that we're aware of and we expect to be in label negotiations.

A follow up question was presented by Adnan Butt ("Butt") with RBC Capital Markets as follows:

> I wanted to ask on Poziotinib, you mentioned the Phase 2 study, when could it start and what types of breast cancer patients would you enroll, would it be a similar population to the prior study? And then on EVOMELA, how quickly could you launch assuming approval, post-approval?

Shrotriya answered as follows:

> Let me talk about EVOMELA, as soon as the approval comes, we plan to launch this drug as soon as possible, it may take a couple of months, but I would think that we should be able to launch quickly after approval. The market is already preparing. As I said, they are having already meetings with the – they're identifying the markets where the growth is, we're meeting all the people who treat transplantations and whatnot.

53.     As the year progressed, Shrotriya's comments regarding the FDA's approval of the EVOMELA NDA became even more definitive.  On September 2, 2015, Spectrum issued a press release announcing that the EVOMELA clinical study, led by Dr. Parameswaran Hari from Frodtert Hospital and Medical College of Wisconsin, was published in the Biology of Blood and Marrow Transplantation ("BBMT) journal, and that this study confirmed EVOMELA's efficacy.

54.     In response, Shrotriya stated:

> These study data confirm the efficacy and acceptable safety profile of EVOMELA as a high-dose conditioning regimen for ASCT in patients with MM.  . . . .We look forward to FDA's NDA decision on EVOMELA in October.  Spectrum continues to deliver on its commitment to develop improved cancer therapies that benefit patients and health care providers.

55.     Defendants failed to disclose that EVOMELA is not clinically that distinct from standard melphalan, a drug that is presently being used in hospitals to treat multiple myeloma.

56.   Shrotriya again noted that EVOMELA would be a "strong growth driver" of revenues for the Company and that he fully expected FDA approval of the NDA at a conference held by Rodman and Renshaw on September 8, 2015.

57.   That EVOMELA would be a driver of the Company's revenues was again iterated at a September 10, 2015 written presentation, at which the Company again stated that "EVOMELA: Strong Growth Driver Potential, PDUFA date October 23, 2015".

**The Truth is Disclosed**

58.   On October 23, 2015 Spectrum issued a press release noting that the FDA issued a Complete Response Letter in responses to Spectrum's NDA for EVOMELA.   The Company reported that a Complete Response Letter is a communication from the FDA that informs companies that an application cannot be approved in its present form.

59.   As a result of this news, Spectrum's stock plummeted $1.31 per share to close at $5.33 per share on October 23, 2015, a one-day decline 20% on volume of 4.8 million shares.

60.   The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

   a.   The differences between EVOMELA and standard melphalan are not clinically meaningful.

   b.   Certain markets for melphalan and including EVOMELA are declining.

   c.   Spectrum is obligated to pay Ligand for regulatory milestone payments and 20% royalties on any future net sales of the drug.

   d.   Based upon the above, defendants lacked a reasonable basis for their positive statements about the Company and its revenue and earnings during the Class Period.

61.   As a result of Defendants' false statements, Spectrum stock traded at artificially inflated levels during the Class Period.  However, the disclosure of the truth, the Company's share

15

were negatively impacted by massive sales, causing the stock price to drop 20% from the Class Period high.

## LOSS CAUSATION

62.     During the Class Period, as detailed herein, the Defendants made false and misleading statements and engaged in a scheme to deceive the market and engaged in a course of conduct that artificially inflated the price of Spectrum securities and operated as a fraud or deceit on Class Period purchasers of Spectrum securities by misrepresenting the Company's business and prospects.  Later, when the truth was disclosed, the price of Spectrum securities fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Spectrum securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e. damages, under the federal securities laws.

## NO SAFE HARBOR

63.     Spectrum's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") was false or misleading and the FLS was authorized and/or approved by an executive officer and/or Shrotriya, who knew that the FLS was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ALLEGATIONS

64.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Spectrum securities during the Class Period (the "Class"); and were damaged upon the

revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Spectrum securities were actively traded on the NASDAQ.

65.     While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Spectrum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal laws that are complained of herein.

67.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Spectrum;

c.   whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

d.   whether the prices of Spectrum securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

e.   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

69.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

70.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   the omissions and misrepresentations were material;

c.   Spectrum securities are traded in an efficient market;

d.   the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.   the Company traded on the NASDAQ and was covered by multiple analysts;

f.   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.   Plaintiff and members of the Class purchased, acquired and/or sold Spectrum securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

71.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

72.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## FIRST CAUSE OF ACTION

### Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against Spectrum and Shrotriya

73.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.   This cause of action is asserted against Spectrum and Shrotriya.

75.   During the Class Period, these Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell Spectrum's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and together, took the actions set forth herein.

76.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Spectrum as specified herein.

77.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Spectrum's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Spectrum and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers Spectrum securities during the Class Period.

78.     Shrotriya's primary liability, and controlling person liability, arises from the following: (a) his high-level  positions at the Company during the Class Period and members of the Company's management team of which he had control; (b) by virtue of his responsibilities and activities as a senior officer and/or director of the Company, he was privy to and participated in the creation, development and reporting of the Company's plans, projections and/or reports; (c) he enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's, operations, and (d) he was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

79.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and

to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Spectrum's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

80.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Spectrum's securities was artificially inflated during the Class Period.

81.     In ignorance of the fact that market prices of Spectrum's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Spectrum's securities during the Class Period at artificially high prices and were damaged thereby.

82.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Spectrum's financial results and condition, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Spectrum securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

83.     By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

85.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II
### For Violation of §20(a) of the 1934 Act Against Shrotriya

86.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.     This second cause of action is asserted against Shrotriya.

88.     Shrotriya acted as controlling person of Spectrum within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position, agency, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's dissemination of information to the investing public, Shrotriya had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contend are false and misleading. The Company Defendant and Shrotriya were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

89.     In particular, Shrotriya had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence

the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

90.     As set forth above, Spectrum and Shrotriya each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

91.     By virtue of his position as a controlling person, Shrotriya is liable pursuant to Section 20(a) of the Exchange Act as he culpably participated in the fraud alleged herein. As a direct and proximate result of his wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

92.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff' purchases of securities giving rise to the cause of action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: November _3_, 2015

ALDRICH LAW FIRM, LTD

John P. Aldrich, Esq.
Nevada Bar No.: 6877
1601 S. Rainbow Blvd, Ste 160
Las Vegas, Nevada 89146
Telephone: (702) 583-6748
Facsimile: (702) 227-1975
jaldrich@johnaldrichlawfirm.com

*Attorneys for Plaintiff*

OF COUNSEL:

THE GRANT LAW FIRM, PLLC
Lynda J. Grant, Esq.
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (212) 292-4441
Facsimile: (212) 292-4442
lgrant@grantfirm.com

24